IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICK D. MICHAEL,                               CV 06-6146-MA

        Plaintiff,                          OPINION AND ORDER

v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

        Defendant.


MARTIN J. MCKEOWN, P.C.
JULIAN E. COONS
P.O. Box 11650
Eugene, OR 97440
(541) 683-6235

        Attorney for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1053

1 - OPINION AND ORDER

DAVID R. JOHNSON
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2545

      Attorneys for Defendant

MARSH, Judge.

    Plaintiff Rick Michael brings this action for judicial review of a final decision of the Commissioner terminating his entitlement to disability insurance benefits (DIB) and supplemental security income benefits (SSI) previously awarded pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33 and 42 U.S.C. §1381-83f, respectively.

    This court has jurisdiction under 42 U.S.C. § 405(g).  For the following reasons, the court AFFIRMS the final decision of the Commissioner and DISMISSES this action with prejudice.

## PROCEDURAL HISTORY

    In May 1991, the Commissioner found plaintiff was disabled because of agoraphobia resulting in panic attacks and chronic post cervical fusion pain syndrome and, therefore, awarded SSI effective September 1990.  In 2000, the Commissioner determined plaintiff also should have been entitled to DIB when he was first insured for those benefits in April 1992 and, accordingly, awarded those benefits retroactively to that date.  On July 31, 2001, the Social Security Administration issued a "Cessation of

Disability" notice to plaintiff informing him he was no longer entitled to SSI as of September 30, 2001.  The notice listed a primary diagnosis of "malingering," and a secondary diagnosis of "failed back syndrome."  A second notice was subsequently issued advising plaintiff he was no longer entitled to DIB as of December 31, 2001.

In April 2004, the ALJ held a hearing at which plaintiff, his mother, and a vocational expert (VE), testified.  On April 19, 2005, the ALJ issued a written opinion finding plaintiff's medical condition had improved to the extent that he was able to engage in substantial gainful activity.  Accordingly, the ALJ found plaintiff's entitlement to SSI had ceased effective September 30, 2001, and his entitlement to DIB had ceased effective December 31, 2001.  In May 2005, the Commissioner affirmed the ALJ's decision on appeal.

Plaintiff contends the Commissioner's final decision should be reversed and remanded for an award of SSI and DIB or, in the alternative, should be remanded for a new hearing to allow for additional "comprehensive medical and psychiatric evidence."

The Commissioner asserts his decision relies on substantial evidence and is free from legal error.  Accordingly, he requests that the court affirm the final decision to terminate plaintiff's entitlement to both SSI and DIB.

## BACKGROUND

On the date of the Commissioner's final decision, plaintiff was 47 years old.  He completed the 8th grade.  His past work experience includes security guard, gas station attendant, construction worker, and video arcade attendant.  His last job was in 1996 when he worked as a road paver in Bend, Oregon.

Plaintiff alleges he continues to be unable to work because of severe physical impairments primarily involving chronic back pain following multiple back surgeries in his early 20s, which has led to chronic failed back syndrome.  He also alleges severe mental impairments arising from a personality disorder, chronic anxiety and depression, lack of education, and borderline intellectual functioning.  He contends these physical and mental impairments, when considered separately, meet listings sufficient to establish disability per se, and, if not, render him unable to work when they are considered in combination.

The Commissioner contends none of plaintiff's impairments meet any listing, and although he does have severe physical impairments related his earlier back surgeries, his condition has improved sufficiently to allow him to return to his former job as a security guard or to perform other jobs involving sedentary to light activity that are available in substantial numbers in the national economy.

4 - OPINION AND ORDER

At the heart of the Commissioner's decision is the ALJ's finding that plaintiff is a malingerer whose credibility regarding the extent and severity of his impairments is severely compromised.

### THE ALJ'S FINDINGS

The ALJ's decision on Plaintiff's continued entitlement to DIB and SSI required an eight-step evaluation.  20 C.F.R. §§ 404.1594(f)(1-8) and 404.994(b)(5)(i-vii).[1]

At the first step, the ALJ found plaintiff was not engaged in substantial gainful activity.

At the second step, the ALJ found plaintiff did not have an impairment that met or equaled the severity of a listed impairment or combination of impairments.

At the third step, the ALJ found plaintiff's medical condition had improved.  Medical improvement is established if there is a decrease in the medical severity of impairment(s) present when plaintiff was most recently disabled or continued to be disabled and is determined by comparing prior and current medical evidence showing that there has been improvement in plaintiff's symptoms, signs or laboratory findings.

At the fourth step, the ALJ found plaintiff's medical

---

[1] Continued entitlement to SSI does not require consideration of the first step, but otherwise, the evaluation process is identical to the DIB evaluation process.

improvement was related to his ability to work.

Based on his findings at steps three and four that Plaintiff's medical condition had improved relative to his ability to work, the ALJ did not need to make a finding at step five regarding special exceptions to the medical improvement requirement.

At step six, having found there had been medical improvement related to plaintiff's ability to work, the ALJ found plaintiff had a severe impairment of chronic failed back syndrome.

At step seven, notwithstanding plaintiff's severe impairment, the ALJ found plaintiff had the residual functional capacity to perform work in the sedentary to light range, which included his past relevant work as a security guard.

At step eight, despite his finding that plaintiff could perform his past relevant work, the ALJ also made an alternative finding that plaintiff could perform other jobs that exist in substantial numbers in the national economy, including gate tender, bench assembler, and eye glass assembler.

Consistent with these findings, the ALJ found plaintiff was no longer under a disability and terminated his DIB and SSI.

On May 23, 2005, the Appeals Council affirmed the ALJ's decision and, therefore, that decision became the final decision of the Commissioner for purposes of judicial review.

## LEGAL STANDARDS

The initial burden of proof rests on the claimant to establish disability. <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A). The Commissioner bears the burden of developing the record. <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 849 (9th Cir. 1991).

"When the [Commissioner] has determined that a claimant's disability has ceased, the burden of proof to establish otherwise lies with the claimant. <u>Patti v. Schweiker</u>, 669 F.2d 582, 586 (9th Cir. 1982). The burden "'is a continuing one. It does not cease or shift after an initial ruling of disability has been had.'" *Id.* at 587. An earlier finding of disability, however, "can give rise to a presumption . . . in the absence of proof to the contrary, [that] . . . the condition [causing the disability] remains unchanged." *Id.* (internal citation omitted). The existence of the presumption imposes on the Commissioner "'the burden of going forward with evidence to rebut or meet the presumption'" even though "the ultimate burden

of proof" remains with the claimant.  Id. (internal citation omitted).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert. denied, 121 S. Ct. 628 (2000).  "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).

## DISCUSSION

Plaintiff contends there is "not a scintilla of evidence to support the ALJ's decision" and the ALJ committed clear legal error in finding plaintiff has medically improved sufficient to justify the termination of his entitlement to DIB and SSI. Specifically, plaintiff argues the ALJ erred:

(1) in finding plaintiff was not credible;

(2) in rejecting the opinions of plaintiff's examining and treating physicians, psychiatrists, and psychologists;

(3) in failing to consider plaintiff's combined impairments in assessing his residual functional capacity;

(4) in posing an incomplete hypothetical question to the VE;

(5) in finding plaintiff had the capacity for sustained work;

(6) in finding plaintiff's impairments did not meet or equal any listing;

(7) in finding plaintiff's combined mental impairments do not equate to a disability; and

(8) in finding plaintiff's combined mental and physical impairments do not equate to a disability.

Based on my review of the medical evidence, and applying the applicable legal standards, I conclude the ALJ's findings are supported by substantial evidence and the Commissioner's decision to terminate DIB and SSI is not contrary to law.

## MEDICAL EVIDENCE

The relevant medical evidence is summarized below.

**Plaintiff's Physical Impairments**.

Plaintiff was diagnosed with a disc herniation and underwent a lumbar laminectomy in 1976, followed by a diskectomy in 1977 and repeat operations in 1978 and 1979.  In 1979, he underwent a cervical laminectomy and decompression.  Later that year, he was involved in a motor vehicle accident, resulting in increased neck and upper extremity pain.  He also underwent lumbosacral fusions in 1980 and 1987.

**Plaintiff's Treatment Providers**.

Plaintiff's treatment and accompanying evaluations for his physical impairments since he was found to be disabled in May 1991 are as follows:

1991:  <u>Francis Nash, M.D. - Neurosurgeon</u>.

Dr. Nash found plaintiff continued to suffer chronic pain incident to ongoing physical pain and emotional trauma.  Dr. Nash requested an evaluation by an independent neurological surgeon who had not previously examined plaintiff.

1997:  <u>Mark Belza, M.D.</u>.

Plaintiff was treated at the Bend Neurological Clinic for chronic low back pain and bilateral leg pain and chronic neck and bilateral arm pain.  X-Rays revealed a solid fusion from L4-S1,

but the possibility of pseudathrosis at L5-S1.  An MRI revealed a minor circumferential protusion of the L3-4 disc with minor facet hypertrophic changes.  The L5-S1 fusion was not solid, with mild foraminal stenoses (narrowing of nerve roots), but no other evidence for spinal impingement.

On physical examination, plaintiff had full motor strength in his upper and lower extremities, except "for a slight give-away weakness on the left" in both areas, which the examiner found to be "inconsistent" and "not a true organic weakness."

1997:  Michael Mason, M.D. - Neurosurgeon.

Dr. Mason examined plaintiff and found he had some degenerative joint disease in the mid-thoracic area, mild disc bulging at T6-7, T8, T9, and T11 that might produce discomfort, and a mild mid-line bulge at L5-S1, none of which required surgery.  Dr. Mason concluded that plaintiff was unable to do "any type of physically (sic) work activity" and he recommended retraining in "some less physical work activity."

1998:  Paul Altrocchi, M.D. - Neurologist.

Dr. Altrocchi conducted a limited neurological examination and concluded plaintiff has mechanical problems in the cervical and lumbar regions that should be treated by "manual medicine," i.e., osteopathy, chiropractic, or physical therapy.

11- OPINION AND ORDER

<u>1998</u>:  <u>Edward Ottenheimer III, M.D. - Internal Medicine</u>.

Dr. Ottenheimer examined plaintiff for follow up of chronic
back pain.  He diagnosed chronic cervical, thoracic, and lumber
back pain with progression of weakness on the left.

<u>1999</u>:  <u>Rees G. Freeman, M.D. - Neurosurgeon</u>.

Dr. Freeman examined plaintiff regarding his low back
problems.  He found there was "no neurosurgical entity in
evidence" but he ordered an MRI to "rule out pathology not
apparent presently and to insure the patient of his well-being in
order to push himself and hurt, knowing that he won't damage
himself further in pushing himself."  The MRI confirmed Dr.
Freeman's findings.

<u>1997 - 2000</u>:  <u>Fred J. Black, M.D.</u>

Dr. Black treated plaintiff for cervical and lumbar
degenerative disease.  During that period, plaintiff complained
of chronic radiating cervical and lumbar pain, more so on the
left side.  Plaintiff described pain levels varying from 7-10 on
a 10-point scale, and diminishing to 5-7 with Vicodin, the
strength of which was increased at his request in September 1999.
Dr. Black advised plaintiff the pain medications he was using
were addicting.

<u>2000 - 2001</u>:  <u>Jerry D. Boggs, M.D. - Neurologist</u>.

Dr. Boggs treated plaintiff for failed back syndrome.  He
found "chronic generalized pain in a failed back patient," with

left leg weakness.  He concluded further surgery would not benefit plaintiff and he switched plaintiff's pain medication from Vicodin to Oxycontin.

Dr. Boggs' chart notes reflect plaintiff requested and received oxycontin and xanax refills early for reasons that were unclear to Dr. Boggs.  Dr. Boggs ultimately ordered, on a non-negotiable basis, that plaintiff's Oxycontin and Xanax prescriptions would be refilled no earlier than one month after the last refill.

In January 2001, plaintiff suffered a seizure that Dr. Boggs attributed to benzodiazapine (Xanax) withdrawal.  An EEG was normal, reflecting no predisposition to epilepsy and no seizure activity.

2002:  Mercy Medical Center Emergency Room.

In January 2002, plaintiff suffered a seizure of questionable etiology.  A drug screen revealed elevated liver function tests and was positive for marijuana although on admission to the emergency room, plaintiff denied use of alcohol or drug abuse.  No cause could be found for the seizure.

2001 - 2002:  Brian McNutt, N.P.

Dr. McNutt treated plaintiff for chronic low back pain and prescribed, inter alia, Xanax and Methadone.  In April 2002, Dr. McNutt discharged plaintiff from his care because of evidence that plaintiff was abusing his medications.

13- OPINION AND ORDER

2000 - 2002:  David Reneau, D.C.

Dr. Reneau provided chiropractic care to plaintiff.  He
diagnosed frequent sacro-iliac and mid-back bilateral pain and
gave a poor prognosis.  Based on subjective complaints and
objective findings, he concluded plaintiff's condition was not
medically stationary, but that the pain level was reduced by 20%
with regular chiropractic care.

2002:  Melvyn T. Yeo, M.D. - Mercy Medical Center.

Dr. Yeo performed an inguinal hernia repair.  He advised
plaintiff his pain was excessive compared to his findings and
that he could not guarantee the hernia repair would relieve
plaintiff of his pain in light of plaintiff's "multiple problems
with back pain."

2002:  Ray V. Grewe, M.D. - Neurosurgeon.

Dr. Grewe evaluated plaintiff in January 2002.  Dr. Grewe
stated "this patient has so many problems that make it a
challenge to try to unravel his legitimate organic diseases and a
certain amount of functional overlay."  Dr. Grewe recommended a
lumbar fusion and decompression, and a differential spinal block
for pain relief, with a goal of returning plaintiff "to a level
of better function and hopefully gainful employment."

In a letter dated July 20, 2002, Dr. Grewe opined that
plaintiff "has been totally disabled for some time" as a result
of "severe residuals of several low back operations."  Dr. Grewe

recommended an in-depth pain evaluation and concluded plaintiff would continue to be disabled pending the in-depth pain evaluation.

2003:  Mercy Medical Center Emergency Room.

In February 2003, plaintiff was taken to the emergency room by ambulance and treated for acute exacerbation of back pain with radiation into both his legs and left chest pain.  Dr. Singer noted his chart reflected "past concern about the patient's high dosages and chronic use of narcotics in the past."  Plaintiff did not "clinically appear to be in distress" and was "able to stand up fairly easily" and move his legs relatively easily.  Plaintiff was told no further narcotics would be prescribed.

2002 - 2003:  Legacy Emanual Pain Management Clinic.

Plaintiff was treated for pain management under the direction of Stuart M. Rosenbaum, M.D.  During this period, plaintiff described his pain in the range of 8/10.  He was treated with lumbar spinal differential nerve blocks, resulting in pain reduction of 30%.

2002 - 2004:  Douglas Medical Center.

Plaintiff was treated by several physicians including L. Lee McCullough, M.D.  During this period, he was diagnosed with Hepatitis C, and treated for chronic back pain, sinusitis, headaches, mild bronchitis, possible concussion, and post-traumatic stress disorder.  Dr. McCulloch notes on several

15- OPINION AND ORDER

occasions he had not received any substantive reports from Dr. Rosenbaum regarding plaintiff's treatment at the Pain Clinic. In seven separate reports, Dr. McCulloch lists one objective finding relevant to plaintiff's chronic back pain, to wit - "Generally [plaintiff] sits cross-legged w/o apparent difficulty or grimacing."

In 2004, Dr. McCullough opined that plaintiff was "totally disabled at this time, and is likely to remain so for the foreseeable future."  Dr. McCullough wrote that he would not hire plaintiff based on "relevant medical and social information."

2004:  Peter M. Kosek, M.D.

Dr. McCullough referred plaintiff to Dr. Kosek for a pain consultation.  Plaintiff described his pain as "usually 9/10, as high as 10/10 and as low as 7/10."  During the consultation, plaintiff appeared to be in no distress but he exhibited "moderate increased pain behavior."  Dr. Kosek concluded plaintiff's pain complaints "far exceed his clinical findings" and that he is "neurologically embellished, but intact, today." Dr. Kosek was "concerned that some of his physical complaints are highly modulated by his psychological status."

**Non-Treating Examiners and Consultants.**

The ALJ relied on the following medical records provided by non-treating medical examiners and consultants retained to determine the extent of plaintiff's physical impairments.

1999:  <u>Joel Seres, M.D. - Neurosurgeon</u>
       <u>Scott Kitchel, M.D. - Orthopedist</u>.

Dr. Seres reviewed plaintiff's medical records and examined
him.  He assessed chronic cervical and low back pain, pain
involving the entire left side of the body associated with
numbness.  He found no objective evidence, however, that
plaintiff could not perform a range of jobs.  He found plaintiff
"had some difficulty being forthright and truthful, in that he
acknowledged only using prescribed Vicodin, but had a positive
urinalysis for methamphetamine and amphetamine.

Dr. Kitchel reviewed plaintiff's records and Dr. Seres'
report, and concurred with Dr. Seres' opinion that plaintiff
could return to work.

2001:  <u>Anthony L. Glassman, M.D. - Physical Medicine</u>.

Dr. Glassman reviewed medical records, including Dr. Seres'
report, and examined plaintiff.  He also discussed plaintiff's
condition with Dr. Boggs.  Dr. Glassman diagnosed chronic failed
back syndrome and concurred with Dr. Boggs' recommendation that
plaintiff be referred to Northwest Pain Clinic for "pain
program/pump implementation."  He concluded plaintiff is "best
suited for light duty work lifting 20 lbs. occasionally, 10 lbs.
frequently, sitting frequently, and standing occasionally."
Dr. Glassman opined plaintiff was capable of working a normal day
shift.

2001:  <u>Linda Jensen, M.D. - DDS</u>.

Dr. Jensen completed a residual functional capacity form based on medical records she reviewed, and essentially agreed with Dr. Glassman's work limitations.

**Plaintiff's Psychological Impairments.**

As noted, plaintiff was previously found to be disabled, in part, based on a diagnosis of agoraphobia with associated panic disorder.

**Plaintiff's Treatment Providers.**

Plaintiff's medical records regarding his psychological impairments since the original disability determination are as follows:

<u>1990-1995</u>:  <u>Douglas County Mental Health</u>.

In 1990, Douglas Eckstein, M.A., a Mental Health Specialist, began treating Plaintiff for his panic disorder.  The record reveals plaintiff frequently did not show up for appointments, and was inconsistent in his participation in therapy sessions. During this period he was diagnosed with major depression and cannabis abuse, and multiple adjustment problems.  In a chart note from 1993, plaintiff, however, reported he had "totally stopped cocaine and amphetamine abuse."

In 1995, plaintiff's case was closed.  Mental Health Specialist Tonya Hall concluded plaintiff "really needs to be in

inpatient drug and alcohol treatment before he can possibly
benefit from therapy here."

2001:  G. William Salbodor - Psychiatrist.

In September 2001, Dr. Salbodor treated plaintiff for
depression and pain disorder with physiological and psychological
contributions.  Dr. Salbodor noted plaintiff's cognition appeared
to be grossly intact although it was not specifically tested.  He
assessed plaintiff as probably being dependent on Xanax and
opiates.  Plaintiff was initially resistant to changing
medications or to starting antidepressants.  Dr. Salbodor's
plan was to substitute Klonopin for Xanax.  In November 2001,
Dr. Salbador described plaintiff as "looking very healthy,
glowing."  In December 2001, however, plaintiff failed to show
for his appointment.

**Non-Treating Examiners and Consultants.**

1999:  Eugene Klecan, M.D. - Psychiatriast.

Dr. Klecan examined plaintiff and reviewed his medical
records.  During the examination, plaintiff was histrionic, with
an occasional contrived facial expression of pained suffering and
occasionally appearing to be in no pain.  Dr. Klecan had the
"impression of someone trying to portray a fictional role."
He noted plaintiff lied about his criminal background, past drug
and alcohol abuse, and number of divorces (at least four).  He

was insincere and shallow, with no true signs of depression or melancholy.  Plaintiff was alert and well in touch with his surroundings, with no hint of hypervigilance or physiologic arousal, such as tremor or sweating.  His concentration was normal and his long-term and short-term memory was intact.

Dr. Klecan diagnosed malingering, multiple chemical drug abuse and drug seeking, and extreme personality disorder with prominent anti-social features, which are voluntary.

Dr. Klecan opined that, from a psychiatric perspective, plaintiff was psychologically able to perform the jobs of service-station attendant, hotel desk clerk, video rental counter clerk, and road roller operator.

2000, 2002:  Michael Villanueva, Psy.D.

In June 2000, Dr. Villanueva examined plaintiff at the request of the Department of Disability Services (DDS).  He reviewed plaintiff's medical records and noted plaintiff's tendency to visit the emergency room for narcotic pain medication.  During the course of the examination, plaintiff was animated and reported pain on a scale of 8/10, but showed no other evidence of extreme pain.  Plaintiff's attention span was adequate and his abstract reasoning appeared grossly intact.  Dr. Villanueva diagnosed mixed personality traits and assigned a GAF score of 65 (mild symptoms of depression, some difficulty

in social or occupational functioning, but generally functioning pretty well).  DSM-IV (4th Ed. 1994) Global Assessment of Functioning, p. 32.  He saw no evidence of marked difficulties with anxiety and did not believe plaintiff needed treatment for depression.  Finally, based in part on Dr. Klecan's report, he diagnosed "malingering versus form of somatoform disorder."

In March 2002, Dr. Villanueva again examined plaintiff on behalf of DDS regarding plaintiff's agoraphobia, panic attacks, cervical fusion, and drug and alcohol abuse.  Plaintiff reported he had never abused alcohol or drugs, a history Dr. Villanueva found to be unreliable, particularly in light of a recent positive urinalysis for marijuana use.  During the examination, plaintiff rated his pain at 8 1/2 out of 10.  Plaintiff was administered an IQ test and scored 78 on the verbal, 67 on the performance, and 70 on the full scale.  Dr. Villanueva found plaintiff's test scores "most likely underestimate[d] optimal abilities" for reasons that might be related to "withdrawal from prescribed medications," "distractions secondary to chronic pain and "difficulties with concerted, sustained attention during difficult tasks."  Dr. Villanueva concluded plaintiff's "degree of inactivity," as described, "is contraindicated."  Based on his examination Dr. Villanueva found no reason for any cognitive difficulty and he recommended that plaintiff increase his daily activities.

2001:  <u>Peter LeBray, Ph.D. - Consulting Psychologist</u>.
2002:  <u>Robert Henry, Ph.D. - Consulting Psychologist.</u>

In 2001, Dr. LeBray reviewed plaintiff's medical records and found they supported diagnoses of non-severe psychological impairments of anxiety-related disorder without current symptoms, and personality disorder nos/malingering.  He found plaintiff's psychological functional limitations included mild restrictions of daily living activities, mild difficulties in social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  He found none of plaintiff's psychological impairments met a Listing.

In 2002, Dr. Henry conducted a second review and reached the same conclusions as Dr. LeBray.

2006:  <u>Judith Eckstein, Ph.D. - Psychologist</u>.

In 2006, after the Commissioner affirmed the ALJ's finding that plaintiff was no longer disabled, Dr. Eckstein submitted a psychiatric evaluation in which she found plaintiff suffered from a host of impairments including memory impairment, and emotional lability and impairment in impulse control, and affective disorders of anhedonia (loss of interest), sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  Dr. Eckstein concluded that plaintiff had marked restrictions of daily living activities, marked difficulties in

maintaining concentration, persistence, and moderate difficulties in maintaining social functioning, as well three specific episodes of decompensation of extended duration.

## ANALYSIS

### 1.  <u>Plaintiff's Credibility</u>.

Plaintiff contends the ALJ had no reason to discredit his testimony and subjective complaints.  I disagree.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" (the <u>Cotton</u> test).  <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)); <u>Cotton v. Bowen</u>, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  The claimant need not produce objective medical evidence of the symptoms or their severity.  <u>Smolen v. Chater</u>, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If the claimant meets the <u>Cotton</u> test and there is no affirmative evidence of malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony regarding the severity of his symptoms.  <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  <u>See</u> <u>also</u> <u>Smolen</u>, 80 F.3d at 1283. To determine whether the claimant's subjective testimony is

credible, the ALJ may rely on (1) ordinary techniques of
credibility evaluation such as the claimant's reputation for
lying, prior inconsistent statements concerning the symptoms, and
other testimony by the claimant that appears less than candid;
(2) an unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment;
and (3) the claimant's daily activities.  Id. at 1284 (citations
omitted).

Here, there was affirmative evidence that plaintiff was
malingering.  As noted, Dr. Klecan offered a specific diagnosis
of malingering, and Dr. Villanueva supported that diagnosis.

In any event, the ALJ gave clear and convincing reasons
supported by substantial evidence in the record for discrediting
plaintiff's subjective complaints and his testimony regarding the
severity of his physical and psychological impairments.  He
noted plaintiff's extensive prior criminal history, which
included one felony and two misdemeanor DUII convictions, and
several convictions for forgery and theft involving multiple
counts.  He also noted the opinion of Dr. Kosek that plaintiff's
subjective complaints far exceeded his clinic findings, the
opinion of Dr. Vilanueva that his subjective reports were
inconsistent with available chart information, and Dr. McNutt's
concern regarding plaintiff's use of "subterfuge" to avoid

adverse drug test results.  The record reflects Dr. McNutt and
Dr. Black were sufficiently concerned over plaintiff's drug-
seeking behavior to discharge him from their care, and Dr. Seres
found plaintiff had difficulty being "forthright and truthful."

Finally, the records reflect plaintiff repeatedly misled
doctors and other medical personnel regarding the extent of his
alcohol and drug use and abuse, and a common thread regarding his
treatment for psychological impairments was his frequent failure
to show up for appointments or participate fully in therapy.

On this record, I conclude there is substantial evidence to
support the ALJ's finding that plaintiff's testimony and
subjective complaints regarding his impairments are not credible.

**2.    Plaintiff's Doctors' Opinions.**

Plaintiff contends the ALJ improperly rejected the medical
opinions of his treating and examining doctors, including Dr.
McCullough, Dr. Grewe, and Dr. Mason.  He also asserts this court
should credit Dr. Judith Eckstein's January 2006 report regarding
plaintiff's psychological residual functional limitations.

"An ALJ may reject the uncontradicted medical opinion of
a treating physician only for clear and convincing reasons
supported by substantial evidence in the record." Reddick v.
Chater, 157 F.3d 715, 725 (9th Cir. 1998).  If a treating
physician's medical opinion is supported by medically acceptable

diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight.  An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing reasons supported by substantial evidence in the record."  Id.

Dr. McCullough.

Dr. McCullough opined that plaintiff was totally disabled because of his physical and psychological impairments and was likely to remain so for the foreseeable future.  The ALJ noted Dr. McCullough's opinion was based in part on his statement that he would not hire plaintiff.  The ALJ rejected Dr. McCullough's opinion because the doctor does not identify objective findings to support it.

I also note Dr. McCullough relies on Dr. Kosek's finding regarding lumbar problems and cervical instability even as he notes and apparently disregards Dr. Kosek's conclusion that plaintiff's pain complaints exceed clinical findings.

Dr. Grewe.

As noted, Dr. Grewe opined that plaintiff was totally disabled because of residuals from his low back operations pending an in-depth pain evaluation.  The ALJ rejected his opinion because Dr. Grewe cited no objective findings to support

26- OPINION AND ORDER

it and he did not have the benefit Dr. Kosek's pain evaluation
casting doubt on plaintiff's credibility.

<u>Dr. Mason</u>.

The ALJ did not comment specifically on Dr. Mason's opinion
that plaintiff was unable to perform a job requiring physical
work activity and should be retrained in a job without that
requirement.  Nevertheless, I note Dr. Mason's opinion was given
in 1997, while plaintiff was still entitled to benefits.
Moreover, Dr. Mason did not have the benefit of the more recent
substantial evidence that discredits the reliability of
plaintiff's subjective complaints.

<u>Dr. Eckstein</u>.

Dr. Eckstein found plaintiff has marked limitations
involving his activities of daily living, marked difficulties in
maintaining concentration, persistence, or pace, marked episodes
of decompensation, and moderate difficulties in maintaining
social functioning.

Dr. Eckstein submitted her report after the ALJ made his
findings and the Commissioner affirmed them.  There was,
therefore, no opportunity for the ALJ to comment.  In any event,
Dr. Eckstein offers no reasons for her findings, and in light of
other contradictory evidence on the same issues, Dr. Eckstein's
opinion is unpersuasive.

On this record, I conclude the ALJ did not err in rejecting the disability opinions of some of plaintiff's doctors.

3.  **Plaintiff's Residual Functional Capacity**.

Plaintiff contends the ALJ failed to consider plaintiff's combined physical and psychological impairments in determining his residual functional capacity.  Essentially, plaintiff argues even the most sedentary jobs require a higher degree of education and greater skills than he possesses.  In addition to his specific physical and psychological impairments, plaintiff points to his lack of a significant work history or work skills, his low intellectual functioning, and his inability to interact with others.

The record, however, reflects that the ALJ considered and adopted the physical limitations assessed by Dr. Glassman and Dr. Jensen.  As to plaintiff's mental impairments, the ALJ took into account Dr. LeBray's assessment that plaintiff no longer had symptoms of panic disorder and had only mild restrictions or difficulties in activities of daily living, social functioning and maintaining concentration, persistence, or pace.  The ALJ also considered Dr. Villanueva's finding that plaintiff did not have cognitive difficulties and his impression that plaintiff's IQ scores "most likely underestimate optimal abilities" based on plaintiff's "apparent variable effort" while taking the tests.

All of these considerations, as well as the affirmative evidence of plaintiff's malingering and lack of credibility, significantly undermine plaintiff's argument that the ALJ failed to consider all of his impairments in determining his residual functional capacity.

**4.    VE Hypothetical.**

Plaintiff contends the ALJ's hypothetical to the VE did not include a complete description of his cognitive, mental, and psychiatric findings, as well as his inability to sustain employment.  Plaintiff also contends the ALJ's inclusion of his security guard job in 1992 was improper because it was too remote and for too short a period of time to amount to past relevant work.

I disagree.  Plaintiff performed the security guard job within the past 15 years and even though plaintiff worked at the job for only three months, that was a sufficient period of time to learn the job.[2]  Moreover, I conclude the record as a whole reflects the ALJ appropriately incorporated in the hypothetical all appropriate functional limitations not otherwise discounted by plaintiff's lack of credibility.  Accordingly, I find the ALJ's hypothetical to the VE adequately described plaintiff's past relevant work and his functional limitations.

---

[2] See 20 C.F.R. §§ 404.1565(a), 416.965(a); U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C (4th Ed. 1991).

29- OPINION AND ORDER

5.  __Plaintiff Capacity for Sustained Work__.

Plaintiff's contends the ALJ erred in failing to determine that he is able to sustain a job long-term as a result of his physical and psychological impairments.  Plaintiff points to his failure to do so in the past as evidence of his inability to do so now.  I disagree.  Plaintiff's argument is particularly unpersuasive in light of the substantial evidence of his malingering and lack of credibility.  The record, as a whole, supports Dr. Klecan's opinion that plaintiff's inability to sustain work today is based more on his voluntary choices and motivational factors, not his impairments.

6.  __Plaintiff's Impairments Compared to Listings__.

Plaintiff contends almost all of his physical and psychological impairments meet or equal the following listed impairments.[3] The ALJ found plaintiff has no impairment or combination of impairments that equals or meets any of them.

Listing 1.04 - Spine Disorders.

Plaintiff asserts his prior neck and back operations, his pain, and the resulting functional limitations as evidence that his physical impairments meet this description.

I disagree.  Listing 1.04 requires evidence of nerve root compression, spinal arachnoiditis (inflammation of the membrane

──────────────

[3] See 20 C.F.R. pt. 404, subpart P, app. 1.

30- OPINION AND ORDER

covering the spinal cord), or lumbar spinal stenosis resulting in pseudoclaudication.  Based on an MRI performed in 2002, the ALJ properly found there was no evidence that plaintiff suffers from any of these conditions.

Listing 12.04 - Depression.

Plaintiff asserts he has a severe and chronic mood disturbance that has persisted in some degree for many years and meets the "A", "B", and/or "C" criteria for this listing.

I disagree.  Listing 12.04 requires a degree of severity significantly beyond that exhibited by plaintiff's GAF score of 65 in 2000, which reflects "mild symptoms" of depression.

Listing 12.05 - Mental Retardation.

Plaintiff asserts the results of the IQ test administered by Dr. Villanueva establishes he has a borderline IQ that, when considered in connection with other psychological impairments relating to activities of daily living, social functioning, and maintaining concentration, persistence, or pace, require a finding that he meets or equals Listing 12.05.

I disagree.  First, there is evidence plaintiff did not put a great deal of effort into the test and, therefore, his "optimal abilities" were not assessed.  In any event, the ALJ properly found plaintiff's other psychological impairments were mild.

Listing 12.06 - Anxiety Disorders.

Plaintiff asserts he still meets the criteria for this listing based on the 1991 diagnoses of agoraphobia and panic attacks.

I disagree.  Plaintiff's evidence that he continues to suffer from this impairment is based wholly on his subjective complaints.  In 1991, however, the issue of his credibility was not addressed.  In addition, the ALJ noted Dr. LeBray's finding that plaintiff had only mild functional limitations with no current symptoms of panic attacks that do not meet the criteria for the listing.

Listing 12:08 - Personality Disorder.

Plaintiff asserts he meets this listing because he has a personality disorder that manifests itself in his inability to hold a job in a competitive work environment, his "problems with the legal system," his continuous reliance on his mother, and his lack of adaptive skills.

I disagree.  There is no doubt plaintiff has a personality disorder that manifests itself in many of ways he describes, but there is substantial evidence in the record that his problems are caused by his own purposeful conduct.  Dr. Klecan's conclusion that plaintiff has chosen voluntarily to behave the way he does is persuasive.  In addition, Dr. Villanueva's finding of mild limitations caused by "mixed personality traits" negates plaintiff's assertion that he meets the criteria for this

listing.

In summary, on the record as a whole, I agree with the ALJ's findings that none of plaintiff's impairments, either separately or in combination with others, meets or equals any Listing.

**7.    <u>Plaintiff's Combined Mental Impairments</u>**

For the reasons stated above, I conclude plaintiff's combined mental impairments do not render him disabled.

**8.    <u>Plaintiff's Combined Mental and Physical Impairments</u>.**

For the reasons stated above, I also conclude plaintiff's combined mental and physical impairments do not render him disabled.

<u>CONCLUSION</u>

For all the above reasons, I conclude there is substantial evidence in the record to rebut the presumption that plaintiff's disability continued, and the ALJ did not err in finding plaintiff's entitlement to SSI ceased in July 2001 and his entitlement to DIB ceased in October 2001.  Accordingly, the final decision of the Commissioner is AFFIRMED and this action is DISMISSED with prejudice.

IT IS SO ORDERED.

DATED this 11 day of April, 2007.


                                    /s/  Malcolm F. Marsh
                                    _____

Malcolm F. Marsh
United States District Judge

34- OPINION AND ORDER